## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jared Fyle,

    Plaintiff,

              **COMPLAINT**

v.             Jury Trial Demanded
              Under FRCP 38(b)

Tyler Leibfried, acting in his
individual capacity as a Duluth
Police Officer, and the City of Duluth,

    Defendants.

For his Complaint, Plaintiff Jared Fyle ("Fyle") states and alleges as follows:

## <u>INTRODUCTION</u>

1.  This is an action for money damages for injuries sustained by Fyle after being shot in the back without legal justification by Duluth Police Officer Tyler Leibfried ("Leibfried").

2.  On September 12, 2020, Defendant Leibfried and his partner, Duluth Police Officer Cory Lindsholm ("Lindsholm"), traveled to Fyle's apartment building after several 911 calls (from other residents in the building) reporting a loud argument between Fyle and his girlfriend, Katie Kosloski ("Kosloski"). The officers spoke to Kosloski, who they met at the front door of the building, and she reported that no physical assault had occurred; she simply wanted to get some of her belongings from Fyle's apartment and then leave. Before heading to Fyle's apartment, both officers determined there was no

probable cause to arrest Fyle for any crime and planned to treat the matter as a civil dispute.

3.      Upon reaching Fyle's apartment, the officers heard two loud bangs from behind the closed apartment door.  Approximately 12 seconds then passed without any other noises when, without either officer providing any commands, warnings or ever identifying themselves as police officers, Defendant Leibfried opened fire with his service weapon, firing six shots in two separate volleys through the closed apartment door.  Inside his apartment, Fyle was hit once in the back, causing him serious injuries.

4.      Officer Lindsholm did not fire any rounds because, as he told the Minnesota Bureau of Criminal Apprehension ("BCA") two days later, "I wasn't going to start putting rounds into this apartment just on a guess" where the loud bangs had come from or what had caused them.

5.      Defendant Leibfried reacted differently—unreasonably according to his partner's description and his superiors' review of the shooting—by blindly firing through a closed apartment door six times.  That unreasonable decision was compounded by the fact that Fyle had no reason to believe police were outside his door, as Leibfried later admitted.

6.      A warning was feasible, and therefore required, before Leibfried started shooting, but Leibfried remained silent and subjected anyone in his weapon's path to gunfire.

7.      The below screengrab is from Defendant Leibfried's Body Worn Camera ("BWC") video from the day in question.  It shows him holding his handgun (at the top

of the image) after firing four shots through the closed door.  The door has visible holes in it from Defendant's rounds.



After his initial volley of four shots, Leibfried paused, said nothing, heard Fyle screaming "Stop!" and "Ow!" and then fired two more shots without saying a word.

8.      Fyle, inside his own home, was unarmed and posed no threat to Leibfried or anyone else when the shooting took place.

9.      The Duluth Police Department quickly recognized that Leibfried's conduct was improper, suspending him indefinitely in the shooting's aftermath.  The St. Louis County Attorney's Office agreed, charging Leibfried with the crimes of second-degree assault and recklessly discharging his firearm, although a jury ultimately acquitted him.

10.     Leibfried's improper use of deadly force, while acting under color of state law, violated Fyle's well-settled and clearly established federal civil rights.

**<u>THE PARTIES</u>**

11.     Fyle was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota.

12.     Leibfried was, at all times material herein, a citizen of the United States, a resident of the State of Minnesota, and a duly appointed and acting officer of the City of Duluth Police Department.  He is sued in his individual capacity for misconduct occurring under color of state law.

13.     The City of Duluth is a municipality duly incorporated under the laws of the State of Minnesota.

## JURISDICTION AND VENUE

14.     Fyle brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned constitutional and statutory provisions confer original jurisdiction of this Court over this matter.

15.     This action arises purely out of federal law.  State-law claims and, by consequence, any limitations and defenses available under state law are not applicable to this civil-rights lawsuit.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to this action occurred in this District.

## THE CALL

17.     During the evening on September 12, 2020, Defendant Leibfried responded to the Kingsley Heights apartments after several residents called 911 reporting loud

arguing, items being thrown around, and a woman yelling something to the effect of, "Get off me!"  There was no report of a weapon being involved.

18.     Defendant Leibfried met Kosloski outside the entrance to the building and observed she was upset and excited, but there were no signs of injury or assault.

19.     Officer Lindsholm arrived shortly thereafter. He was present by the time Defendant Leibfried asked Kosloski, "You two didn't physically fight or anything like that?"  Her response was, "He tried to, but I wasn't going for it."

20.     Neither officer had any dealings with Kosloski or Fyle before September 12, 2020.

21.     Neither officer inquired whether a weapon was involved.

22.     Neither officer had reason to believe Fyle was armed when they subsequently entered the building and approached his apartment on the third floor, Unit #301.

23.     Kosloski informed the officers that Fyle was alone in the apartment.

24.     Before heading upstairs to Unit #301, both officers concluded that there was no probable cause for arrest.  They both concluded this would be treated as a civil matter.

25.     Officer Lindsholm later confirmed to the BCA that he had no cause to arrest Fyle.  To him, it sounded like a civil dispute between a couple and not a criminal investigation.  His mission on the way upstairs was to get some of  Kosloski's property and interview Fyle.

26.     Similarly, Defendant Leibfried told the BCA this "came out as a physical domestic but we were handling it is [sic] almost like a civil standby kind of thing like couple is having some issues, get some property."  Leibfried added, "We don't have any charges here."

27.     All of the objective evidence leading up to the officers' approach to Unit #301 indicated that no weapons were involved in this call.

## THE SHOOTING

28.     Once on the third floor, Defendant Leibfried led the way down a narrow hallway to Unit #301.

29.     Neither officer had his weapon drawn as they approved Fyle's door.

30.     Defendant Leibfried, in fact, walked upstairs with a notebook in his left hand and a pen in his right hand.

31.     Neither officer knocked on Fyle's apartment door, made any type of announcement, or gave any commands.

32.     Instead of standing in front of the apartment door, Defendant Leibfried tucked into an alcove next to Unit 301.  Officer Lindsholm remained in the hallway but avoided the area directly in front of Fyle's door.

33.     Below is a view from Officer Lindsholm's BWC video shortly before the two loud bangs are heard.  Part of Leibfried's head is seen in the alcove:



34.     Officer Lindsholm described his partner occupying "a little corner around the doorway" and thinking, "He should go over that way, and he automatically did right away."

35.     With the officers standing away from the apartment door, Leibfried agreed at his criminal trial that a person in Unit #301 would have had no reason to know the police were standing outside his/her door.

36.     Leibfried further conceded there was no way Fyle could have known he was outside and therefore no way for Fyle to surrender, if he had been so commanded.

7

37.     Then, two loud bangs could be heard, captured on both officers' BWC video at timestamp 02:35:59, correlating to 9:35:59 pm.

38.     The sounds were Fyle hitting the inside of the apartment door.

39.     Officer Lindsholm later told the BCA he thought someone was shooting at the officers from inside the apartment.

40.     After hearing the loud bangs, Officer Lindsholm ran down the hall and took "cover behind a wall."  He told the BCA:

OL     Someone knows that we're here. And uh so I, I ran down the other hall where we came from and take cover behind a wall. I knew Tyler was covered as much as I know, I don't know how far back that corner went, um but I know he had some cover there at least. And uh so I heard the, the two shots from the apartment. I took cover. And I tried telling Tyler to come back to me, 'cuz I didn't know how much he had back there. So I'm like come back to me where we both have decent cover. I remember yelling to him a couple times to come back, say I had him covered in case he wanted to run back. Um I sat there for a little bit, and it was just, it was little bit of quite. I couldn't tell you how long. And then I just, I heard more shots, and I didn't know if it came from the apartment or where. By this time I mean my ears ringing. I couldn't really hear anything. I couldn't really hear anything. Um I don't know how many shots came out after that. Um and then I just hear like screaming from downstairs. People [inaudible] come out of their apartments, and it's just [inaudible] chaos of people yelling and screaming. And I'm yelling for Tyler, 'cuz I don't know if he's hit. I don't know if he's okay. I don't know where he's at other than the last place I saw him. Um eventually I think a couple more shots ring out and he came, ran back to me. We got [inaudible] kinda recoup. Quick check each other as much as we can. I remember Tyler telling me that, 'cuz I had, I had backed up another wall too, 'cuz I didn't know where these shots were coming from anymore. I mean I don't know if it's someone else, a different apartment, I don't know…

41.     With regard to Defendant Leibfried's location of cover, Officer Lindsholm told the BCA:  "[J]udging by the size of it I knew Tyler could fit over there, but I don't. As far as somewhat knowing the building I knew that it wasn't another full hallway.  It's not like both of us could stand down there."

42.     Asked to describe the source of the noise, Officer Lindsholm said "it sounded like it was coming from the apartment."

8

43.     Officer Lindsholm retreated down the hallway and positioned himself in a perpendicular hallway.

44.     Officer Lindsholm's BWC video shows him in that position of cover in a third floor hallway perpendicular to the hallway leading to the apartment.  Officer Lindsholm had his gun drawn:



45.     At the same time, Defendant Leibfried's BWC video shows him with cover in the alcove, also with his gun drawn.  Fyle's apartment door remained closed from the time the two sounds were heard through his two separate shooting volleys into the apartment:



46.     Defendant Leibfried told the BCA it "felt like two shots came through the door at us."  He added that he thought Officer Lindsholm may have been shot.

47.     Yet, after the two sounds there were no holes left in the door or walls of Fyle's apartment.  That would inform a reasonable officer with a view of the same that shots were not fired into the hallway from inside the apartment.  Defendant Leibfried had such a view but he unreasonably opted to use deadly force without warning, without identifying a target, and without identifying himself as a police officer.

48.     At least twelve seconds elapsed between the  two loud sounds and the time Defendant Leibfried fired the first volley of four shots into the apartment.

49.     Defendant Leibfried claimed he heard the sound of "racking" or "metal on metal" before he shot, claiming he then believed an individual in the apartment was preparing to shoot again.

50.    During the twelve seconds, Officer Lindsholm can be heard on Defendant

Leibfried's BWC stating:  "Back here, Tyler.  Back here, Tyler.  Covered.  Covered.

Tyler.  Tyler."

51.    Officer Lindsholm explained to the BCA what he was attempting to relay to

his partner before Defendant fired:

| | |
|---|---|
| CL | So you hear two shots. |
| OL | Yeah. |
| CL | You retreat around the corner. |
| OL | Yep. |
| CL | And from that point you hear more shots? |
| OL | Yeah. I retreat around the corner. I remember yelling at Tyler that I had his cover, 'cuz I wanted him to get back, 'cuz I didn't know. I guess I had a feeling it was coming from that 301, but I didn't know if there was another apartment around the corner and for some odd reason maybe there's shots over there. |
| CL | Um-hm. |
| OL | Um but I knew it was from that direction. So I'm telling him to get out of there, 'cuz I know that's now the worse spot to be is he's stuck in this corner with shots ringing out. Um I told him a couple times come back. I got your cover. I got your cover. And then uh I heard more shots. And that's when I retreated back again a little bit, um 'cuz I didn't feel like that was a good spot anymore, 'cuz I, I just, at this point I didn't know anything was coming from and I couldn't hear anything anymore. Um I know my ear was ringing pretty bad so. |
| CL | And the more shots, did they came from Tyler or from inside the apartment? |
| OL | Um [inaudible] couldn't confirm that for sure. I just know I just heard gunshots. I know they sounded a little bit different, but can't say one or the other. |
| CL | Did you ever uh had a chance to ask Tyler if he shot or? |
| OL | No, no. I had only thing I asked him if he was okay and wanted to check each other's to make sure we weren't hit. |

52.    Officer Lindsholm clearly did not expect his partner to start shooting.

53.    Defendant Leibfried told the BCA he did not see any sign of movement

behind the door prior to shooting.

54.    Leibfried fired four shots in rapid succession.  Immediately thereafter, Fyle

can be heard screaming "Stop!" repeatedly and he said "Ow!"

55.     Defendant Leibfried did not respond or say anything.  Again, no orders were given and no warning was communicated that more deadly force would be used.

56.     Instead, without any more noise or other indicia that could reasonably be perceived as a threat, Defendant Leibfried blindly shot into the apartment twice more through the door in rapid succession.

57.     After this second unreasonable volley, Fyle can be heard screaming, "Please stop!" "Help!" "I got shot!" "Open the door!"

58.     Below is the outside of Fyle's door and frame showing damage from Defendant's bullets:



59.     All six of Leibfried's bullets resulted in Fyle being unreasonably seized under the Fourth Amendment.

60.     Officer Lindsholm did not fire any shots.

12

61.     After the sixth shot, Defendant Leibfried radioed to "start medical" and then retreated down the hallway

62.     Less than a minute after blindly firing the shots in two distinct volleys, Defendant Leibfried was still uncertain whether Fyle was alone in the apartment.  Just prior to the below screengrab from his BWC, Leibfried told Officer Lindsholm, "We have to move up because if there's someone else in there."



63.     BCA Special Agent Chad Layon later asked Officer Lindsholm:  "Did you at any point discharge your firearm?"  Lindsholm's answer reveals the unreasonableness of his partner's decision to shoot:

OL     I did not, no. Um part of that reason, if I can tack onto that is being that I was I, I didn't know for sure where these shots came from so I wasn't gonna just start putting rounds into this apartment just on a guess so….

CL     Um-hm.

OL     …but I knew to have it out just in case if, as soon as I know something and I can engage a threat I'm ready for it though.

CL     Sure.

## DEFENDANT LEIBFRIED'S OBJECTIVELY UNREASONABLE DECISION

64.     Defendant Leibfried's stated reason for shooting establishes its objective unreasonableness.  Leibfried allowed his experience in a critical incident 20 months earlier, a shooting in 2019, to affect his judgment on this call.

65.     The City of Duluth failed to train before this earlier incident or to retrain Leibfried afterwards to ensure he was properly trained and equipped to make objectively reasonable force decisions in light of the facts and circumstances he faced.

66.     On January 13, 2019, Leibfried was part of a large-scale response to a domestic assault call after a male reportedly used a weapon against a female.  Defendant Leibfried testified that he saw a male with a firearm and the male ultimately shot at officers through a door.  Although he was not hit, Leibfried testified that he felt the force of the bullet almost touching him; he described the event as a "life-changing thing."

67.     Below is one of the BCA summaries regarding the alleged events of January 13, 2019:

According to the BCA's preliminary investigation, Duluth police officers responded to an apartment on the 2300 block of West 4th Street at approximately 8:30 p.m. on Thursday, Feb. 25, in response to a 911 call from a third party about a possible physical domestic. Officers spoke with the apartment's female occupant and could not determine whether an assault took place. Officers determined that a male occupant of the apartment, now identified as David Conwell, had felony warrants and they entered the apartment to locate and take him into custody. They had no indication at that point that Conwell may be armed.

While searching the home officers encountered Conwell hiding in a bedroom closet. As K9 Luna was attempting to apprehend him, Conwell produced a shotgun. Conwell shot at the officers, fatally striking K9 Luna. The other officers returned fire. They continued to fire as they retreated from the home. There is no indication that Conwell was struck by either exchange of gunfire. Duluth's Tactical Response Team (TRT) was dispatched to the scene and a standoff began.

Over the next several hours, TRT members tried several electronic means of communicating with Conwell and deployed chemical irritants multiple times to try to force him to exit the apartment. At approximately 3 a.m. Friday, TRT members entered the home. As they entered a bedroom Conwell emerged from a closet and began shooting at them. Officers returned fire and retreated out of the building. There is no indication that Conwell was struck by this exchange of gunfire.

After 10 hours, St. Louis County Sheriff's Office Emergency Response Team (ERT) relieved the Duluth TRT at the scene.

ERT members continued to deploy chemical irritants to no avail. At approximately 4 p.m. Friday, ERT members entered the building, determined that Conwell was in a second floor closet. They removed a section of the exterior wall of the closet. Conwell jumped through the hole onto the porch and pointed his gun at the deputies. Two deputies fired their rifles and two deputies fired less lethal rounds, striking Conwell.

Deputies provided medical aid but Conwell was pronounced deceased at the scene.

14

68.     Moving forward to the Fyle shooting, Defendant Leibfried's criminal defense counsel asked him at trial, "What were you thinking when you heard those two sounds?"  Leibfried testified, "This is January 13, 2019 all over again."

69.     At his criminal trial for the Fyle shooting, Defendant Leibfried referenced Duluth Police Officer Gary Wilson, who was shot and killed in 1990 while responding to an armed assault call.  The suspect fired at officers through his hotel room wall.  Asked whether anything else was on his mind when he heard the two loud bangs, Leibfried responded, "[O]fficers get killed through doorways, and my thought was the only cop that's been killed in Duluth in the last 40 years was shot and killed through a wall and door."

70.     It is an objectively unreasonable use of force to discharge a weapon through a closed door without knowing who or what is on the other side, including whether any threat of serious bodily injury or death had been posed.

## THE AFTERMATH

71.     BCA Agents Chad Kleffman and Adam Wright interviewed apartment resident and neighbor Melissa Haberling (Unit #306) on September 13, 2020.  She relayed hearing "loud sounds" that sounded like "frying pans being banged together" immediately followed by "obvious gunshots" from the same area.

72.     Agents Kleffman and Wright interviewed apartment resident and neighbor Keith Gustafson (Unit #302) on September 13, 2020.  He relayed hearing arguing and then "loud noises" from the area of Unit #301, followed by six rapid gunshots.

73.     BCA Agents Don Newhouse and Nathan Adams interviewed apartment resident and neighbor Robert Bauman (Unit #300) on September 13, 2020.  He relayed hearing arguing, a female banging on the door to be let in and then a "loud bang" as if the door of Unit #301 was struck with an object.  Bauman stated that loud bang did not sound like gunfire but the sounds that followed did.

74.     Fyle was unarmed for the entirety of the incident.  No firearm or ammunition was found in his apartment, other than Defendant Leibfried's bullets and evidence of their impact.

75.     Fyle was removed from the apartment without incident.

76.     Mayo Ambulance responded to the scene and ultimately transported Fyle to St. Mary's Medical Center in Duluth.

77.     In his narrative, Paramedic Jeremy Matts included the following report:

---

**NARRATIVE**

23 year old male found prone on sidewalk alert and oriented to person, place, time and event. Airway- open Breathing- slightly increased rate and normal quality. Circulation- skin pink, warm and moist.

Patient reporting being shot through his door at home. PD on scene with no additional information. Unknown caliber of firearm. Patient reporting pain in his right shoulder and denies any other injuries.

---

78.     Defendant Leibfried and his fellow officers opted not to inform paramedics that Fyle had been shot with a Duluth Police Department bullet.

79.     Even before that, Defendant Leibfried and Officer Lindsholm were not forthcoming with information about the actual shooter.  As officers escorted Fyle downstairs one officer said, "We don't know who shot you.  We don't know where they are."  Fyle said something to the effect of, "Police Department shot me."

16

80.    Officers instead were more concerned with Leibfried keeping quiet about the incident, with one stating, "Sometimes guys start fucking flapping their mouth." Defendant Leibfried was escorted away from the scene before Fyle was brought out of the apartment, with a Duluth Police Department Officer or Sergeant telling another , "I told Tyler to shut the fuck up and I sent him down to his car."

81.    Within a few months of the shooting, Defendant City of Duluth determined Defendant Leibfried's use of deadly force was contrary to policy and training.  The City placed him off-duty indefinitely:

DATE: 12/16/2020
SUBJECT: Administrative Review of Officer Involved Shooting Complete
BY: Ingrid Hornbrook

NATURE OF INCIDENT: Officer Involved Shooting
CASE NO.:
INCIDENT DATE: 9/12/2020
INCIDENT TIME:
INCIDENT LOCATION: 100 Blk E 1st St

[DULUTH, MN] The Duluth Police Department has completed the administrative review of the officer involved shooting, which occurred on September 12, 2020 at 105 East First Street.  In this incident, Duluth police officer Tyler Leibfried was investigating a domestic violence incident and, upon hearing what he believed to be gunshots, shot through a closed door inside of an apartment and injured Mr. Jared Fyle.

The administrative review included the analysis of Duluth police officer Leibfried's actions for consistency with department policies and training.  The review included an examination of the investigation conducted by the Minnesota Bureau of Criminal Apprehension and the felony complaint filed in St. Louis County Court by the St. Louis County Attorney's Office.

We believe that Officer Leibfried's actions were contrary to Duluth Police Department policies and training guiding use of force.

Mr. Leibfried is off duty indefinitely. As this is a personnel matter, no further data can be released at this time pursuant to Minn. Stat. 13.43.

82.    Defendant Leibfried was subsequently charged with two felonies as a result of this incident.  A jury acquitted him and he is now back on the job as a City of Duluth Police Officer.

83.    Leibfried's criminal trial included testimony from City of Duluth training officers, who testified that his use of deadly force was improper.

84.     Duluth Police Department Sgt. Joel Olejnicak was asked to do a force review on behalf of the City.  He examined BWC footage, reports, BCA interviews, policies and best practices.  Sgt. Olejnicak concluded it was not reasonable for Defendant Leibfried to fire through Fyle's door.  He testified:

> [T]he officer doesn't know what made those sounds.  There's no clear identifiable target as far as a deadly force threat, it violates the rules as far as identifying what your deadly force threat is, and is it still a deadly force [sic] at the time you decide to use deadly force.

85.     Retired Duluth Police Lt. Robert Shene also conducted a force review.  Lt. Shene was with the department for 23 years.  He testified:

> I don't think the first four [shots] were justified.  To fire two more, again, what's your target?  What's in the room?  Who is in the room?  What's the floor plan?  Where are those rounds going to go?  And what threat at that point are you targeting?

## **FYLE'S INJURIES**

86.     Defendant Leibfried shot Fyle in the back, near his right shoulder blade.



87.     Diagnostic studies revealed a nondisplaced comminuted scapular fracture

with a retained foreign body (bullet fragment):



88.   A follow-up x-ray from the next day showed the largest bullet fragment had

migrated from the scapula to the ribs:



89.   Fyle's fractured scapula and the retained bullet fragment caused prolonged

and severe pain.  The entry wound created a scar that serves as a reminder of Defendant

Leibfried's unreasonable and unconstitutional actions.

## CLEARLY ESTABLISHED LAW

90.   Leibfried seized Fyle by using deadly force on him, firing his service

weapon six times, with one of the bullets striking Fyle in the scapula.

91.   Clearly established constitutional precedent required that Leibfried's use of

force on Fyle on September 10, 2020 be "objectively reasonable."  *Graham v. Connor*,

490 U.S. 386, 396-97 (1989).

92.     *Graham* and its Fourth Amendment progeny render Leibfried's subjective beliefs and intentions irrelevant, because the test examines what an objectively reasonable officer would do under the circumstances. *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000).

93.     Clearly established constitutional precedent prohibited Leibfried from using deadly force against Fyle on September 10, 2020, unless Fyle posed an immediate threat of death or serious physical injury to Leibfried or others each time Leibfried pulled the trigger on his service weapon. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

94.     Clearly established constitutional precedent required Leibfried to provide a warning, if feasible, before subjecting Fyle to deadly force. *Tennessee v. Garner*, 417 U.S. 1, 11-12 (1985).

95.     No reasonable officer could have considered Fyle to be a fleeing suspect on September 12, 2020.

96.     No reasonable officer could have considered Fyle to have committed a violent felony involving the infliction of serious physical injury or death.

97.     Fyle never resisted arrest or attempted to evade arrest by flight.

98.     Fyle did not pose an immediate threat of death or serious physical injury to officers or others.

99.     Even if one of the officers had reasonably perceived such a threat, which they did not and could not have, a few seconds is enough time to determine an immediate threat has passed, eliminating any prior justification for deadly force. *Cole ex rel. Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020).

100.     Defendant Leibfried violated clearly established law each of the six times he fired at Fyle's apartment door, including when one of his rounds struck Fyle.

101.     Leibfried's misconduct was the direct cause of serious, ongoing injuries to Fyle.

## COUNT ONE

### 42 U.S.C. § 1983
### FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff Jared Fyle v. Defendant Tyler Leibfried, in his individual capacity*

102.     Fyle realleges the allegations set forth above as if fully stated herein.

103.     By the actions described above, Leibfried, under the color of state law, deprived Fyle of his clearly established and well-settled rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

104.     Leibfried subjected Fyle to this deprivation of rights either maliciously or with reckless disregard for whether his rights would be violated.

105.     As a direct and proximate result of the acts and omissions of Leibfried, Fyle suffered permanent injuries, was forced to endure severe pain and mental suffering, and was thereby damaged in an amount to be determined by a jury.

106.     Punitive damages are available against Leibfried and are claimed as a matter of right under federal common law and *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

107.     Fyle is entitled to recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT TWO

**42 U.S.C. § 1983 FAILURE TO TRAIN UNDER *CITY OF CANTON V. HARRIS***
***Plaintiff Jared Fyle v. Defendant City of Duluth***

108.   Fyle realleges each of the preceding paragraphs as if fully stated herein.

109.   The City of Duluth, before September 12, 2020, intentionally, knowingly, recklessly or with deliberate indifference to the rights of citizens, failed to properly train Leibfried in the constitutionally proper use of force.

110.   At his criminal trial, Leibfried likened the narrow hallway leading to Fyle's apartment door to his training on the concept of a "fatal funnel."  He also testified to being trained "multiple times" on the dangers of approaching doorways.

111.   Leibfried testified that the Gary Wilson shooting death was one of the initial things Duluth trained him on in terms of real-life scenarios.

112.   Leibfried further leaned on his training when questioned about Fyle yelling, "Stop!  Stop! Stop! Stop!" after Leibfried's first volley of shots penetrated the apartment door.  He testified the next volley of two shots were consistent with his training. Specifically, Leibfried testified, "[A]s [Lt.] Bob Shene teaches in the academy, you can't multi-task.  Right?  So my thought here is whatever he's—my focus is ending the threat. And he's saying stop, but I'm not going to have a conversation in the middle of someone trying to kill me."

113.   Leibfried testified that his use of force in this case was reasonable in light of his training.  Leibfried's trial testimony reveals a training failure by the City of Duluth.

114.    The facts of this case and Leibfried's trial testimony further reveal that he was unprepared to objectively deal with the effects of the January 13, 2019, shooting on September 12, 2020.  He unreasonably concluded that the 2019 event was repeating itself before shooting into the apartment.

115.    Absent proper training, continued monitoring, and oversight of Duluth Police Officers, including Leibfried, it is foreseeable that instances of excessive force will occur.

116.    As a direct and proximate result of the acts and omissions by the City of Duluth, Fyle suffered permanent injuries, was forced to endure great pain and mental suffering, and was damaged in an amount to be determined by a jury.

117.    Fyle is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jared Fyle prays for judgment against Defendants Tyler Leibfried and the City of Duluth as follows:

1.    That this Court find that Defendant Tyler Leibfried committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983;

2.    As to Count One, a money judgment against Defendant Leibfried for compensatory and punitive damages in amounts to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and pre-judgment interest;

3.      As to Count Two, a money judgment against Defendant City of Duluth for compensatory damages in an amount to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and pre-judgment interest; and

4.      For such other and further relief as this Court deems just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated:  November 9, 2023                    **ROBINS KAPLAN LLP**

                                            */s/ Andrew J. Noel*
                                            Robert Bennett, #6713
                                            Andrew J. Noel, #322118
                                            Kathryn H. Bennett, #0392087
                                            Marc E. Betinsky, #0388414
                                            Greta A. Wiessner, #0401130
                                            800 LaSalle Ave, Suite 2800
                                            Minneapolis, MN 55402
                                            Telephone: 612-349-8500
                                            rbennett@robinskaplan.com
                                            anoel@robinskaplan.com
                                            kbennett@robinskaplan.com
                                            mbetinsky@robinskaplan.com
                                            gwiessner@robinskaplan.com

                                            **OLSON, POOLE & ENVALL, P.A.**

                                            Andrew T. Poole, #0391462
                                            130 West Superior Street, Suite 430
                                            Duluth, MN 55802
                                            Ph.: (218) 727-5384
                                            Email:  andrew@northlandlawyers.com

                                            ***Attorneys for Plaintiff Jared Fyle***